

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-8-2001

# USA v. Barbosa

Precedential or Non-Precedential:

Docket 00-1205

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"USA v. Barbosa" (2001). *2001 Decisions*. Paper 260.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/260

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 6, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1205

UNITED STATES OF AMERICA

v.

LUIS HUMBERTO BARBOSA

        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PHILADELPHIA

(D.C. Criminal No. 98-383-1)
District Court Judge: The Honorable Stewart Dalzell

Argued: December 19, 2000

Before: BECKER, Chief Judge, NYGAARD and FUENTES,
Circuit Judges

(Opinion Filed: November 6, 2001)

        James Kousouros (argued)
        Law Office of James Kousouros
        80-02 Kew Gardens Road
        Suite 1030
        Kew Gardens, NY 11415

         ATTORNEY FOR APPELLANT

          Michael R. Stiles
          United States Attorney
          Walter S. Batty, Jr.
           Assistant United States Attorney
           Chief of Appeals
          Judy Goldstein Smith (argued)
           Assistant United States Attorney
           615 Chestnut Street
           Suite 1250
           Philadelphia, PA 19106

          ATTORNEYS FOR APPELLEE

OPINION OF THE COURT

FUENTES, Circuit Judge:

In July 1998, the Drug Enforcement Agency ("DEA")
arrested defendant Luis Humberto Barbosa for importing
into this country 882 grams of cellophane-wrapped pellets
of heroin, which he had swallowed while in Aruba and
subsequently expelled in a hotel room in Philadelphia,
Pennsylvania. Following the arrest, Barbosa was charged in
a complaint with possession with intent to distribute
heroin. Upon further investigation, the DEA laboratory
determined that the pellets Barbosa had swallowed
contained cocaine base with a purity of 85%, not heroin.

After a jury trial, Barbosa was convicted of possession
with intent to distribute more than 50 grams (i.e., 882
grams) of cocaine base in violation of 21 U.S.C.SS 841(a)(1)
and 841(b)(1)(A)(iii). He was later sentenced to a twenty-
year term of imprisonment. Barbosa appeals his conviction
and sentence, contending that: (1) the District Court should
have sentenced him based upon the drug he intended to
bring into the country (heroin), rather that the drug he
unwittingly, but actually, transported (cocaine base); (2) in
accordance with the Supreme Court's decision in Apprendi
v. New Jersey, 530 U.S. 466 (2000), the issue of which
substance he intended to transport should have been
submitted to the jury for a factual determination beyond a
reasonable doubt; (3) if it was proper to sentence him for

cocaine base, the court erred in sentencing him to a twenty-year mandatory minimum; (4) the District Court erred in denying his motion for a new trial based on newly discovered evidence of payments made to government informants who testified at trial; and (5) the District Court erroneously denied his motions to dismiss the indictment based upon "outrageous governmental conduct."

We conclude that there is no merit to any of these claims, and thus, we affirm the conviction and sentence.

I.

A.

Barbosa was an ancillary part of a larger DEA undercover investigation into South American heroin suppliers who were smuggling the drug into the United States. This investigation ultimately resulted in the seizure of 75 kilograms of cocaine in Aruba and the arrest of five individuals, including Emilio Medina a/k/a Felix Zorilla. As Aruba was a critical point in the smuggling route, the DEA had worked with the Aruban Police Department through the DEA's Curacao Country Office.

During this investigation, the DEA used three paid professional informants: Ramon Disla, Nestora Salcedo, and Miguel Morel. Disla had previously been prosecuted for illegal re-entry after being deported following a drug conviction. While serving his sentence, he and his girlfriend, Salcedo, had cooperated with the Government in order to have his sentence reduced. Once released, he was again deported, but had re-entered the country under a cooperation agreement with the DEA. In total, Disla had received $14,002 and Salcedo had received $47,000 over four years for information, evidence, and expenses in a large number of cases. The DEA had also provided housing for both Disla and Salcedo. Although they had worked for other government agencies as well, Disla and Salcedo had derived the vast majority of their income from the DEA. Morel, by comparison, had received a total of $108,000 over eleven years of work with the DEA but was a minor informant in this case. Under its policy, the DEA made

payments to informants regardless of their progress on a case; these payments were also unconnected to the convictions of any specific individuals.[1] At trial, the Government elicited detailed testimony as to the amounts each of the three informants was being paid on this particular investigation.

At the time these informants were enlisted, the Government possessed information that Zorilla had access to a large amount of heroin in Aruba. The DEA knew that Zorilla had previously been involved in narcotics activities with Disla, and thus directed Disla to contact Zorilla in Aruba to negotiate a deal. Disla, however, did not know Barbosa when he began this work for the DEA. On June 10, 1998, during a tape-recorded conversation, Zorilla asked Disla if he could obtain a United States passport for him to travel internationally but not to enter the United States. Later in the conversation, Zorilla gave Disla the pager number of his friend, "Luisin," an American citizen who had just left Aruba for the United States. According to Zorilla, Luisin was a "straight guy," which Disla later testified meant someone who could be trusted with drugs. Zorilla also stated that he had met Luisin at a restaurant in Aruba after not seeing him for some time. Zorilla then asked Disla whether he knew of anyone who could be used to transport drugs into the United States.

Two days after this conversation, Disla paged Luisin, and the two agreed to meet at the La Familia restaurant in New York; Luisin turned out to be Barbosa. Disla did not record this meeting and did not recall the details of this meeting at trial. However, Disla had a second unrecorded meeting with Barbosa at the same restaurant in July 1998, this time accompanied by Morel, who posed as Disla's partner. At this meeting, Barbosa portrayed himself as a drug dealer who did not import drugs personally. Rather, Barbosa

---

1. During the course of Disla's testimony, it was revealed that he had been paid $100 by the DEA after concluding a certain day's testimony. The defense moved for a mistrial based on this non-disclosure. The District Court conducted a hearing at the conclusion of Disla's testimony, ruling thereafter that the mid-trial payment was for expenses and not payment for testimony.

explained the two ways of transporting drugs -- by swallowing or by enclosing them in some type of rubber device. With respect to the swallowing technique, Barbosa asserted that swallowing drugs was not risky because the drugs were wrapped in cellophane and then in rubber, and that it would cost $10,000 per kilogram, plus an additional $5,000 for expenses, to bring in drugs using a swallower. In between the two meetings at the restaurant, Disla spoke to Barbosa on numerous occasions but similarly did not record any of those conversations.

Disla did, however, record a telephone conversation with Barbosa on July 7, 1998. During this call, Barbosa told Disla that he would talk to Zorilla as soon as Zorilla was ready to carry out a drug transaction because, otherwise, they would be wasting their time. Barbosa also told Disla that the $35,000 per kilogram price (which did not include $15,000 for travel and expenses) that Zorilla was charging for heroin was too high. Barbosa further explained to Disla that the going wholesale price for heroin was $70,000 in New York, leaving $20,000 for profit. According to Barbosa, a swallower would cost $10 per gram of drugs.

During another recorded telephone conversation on July 9, 1998, Barbosa informed Disla that he was going to tell Zorilla how to package the drugs, that he wanted no more than 9 grams of drugs in each pellet, that he wanted the pellets narrow so that they could be more easily swallowed, and that he was familiar with the type of equipment Zorilla used to make the pellets. However, Barbosa had been unable to reach Zorilla to relay this information. Barbosa said that Zorilla was trying to rush the deal and recommended to Disla that they not move hastily as, in any case, there were very few heroin customers in Aruba and Zorilla would be unable to sell the heroin there.

In this same conversation, Barbosa also explained a potential drug deal in which cocaine would be transported from Aruba to Israel and heroin would be brought from Israel to the United States. Barbosa explained to Disla that, in order to bring the heroin from Israel to the United States, the swallower would have to stop in between the two countries, expel the drugs, and reswallow them.

5

According to Barbosa, Zorilla could get the heroin but did not have the money for this transaction.

On July 13, 1998, Disla and Barbosa had another recorded telephone conversation. During this call, Barbosa told Disla that he had someone to transport the drugs, but that this person would be unable to swallow 1,400 grams of drugs. Barbosa also explained the nature of the transaction between Zorilla and Zorilla's supplier, telling Disla that Zorilla's supplier in Aruba initially would only give Zorilla 1,000 grams of heroin but would give an additional 600 grams after being paid for the first 1,000 grams. Barbosa also told Disla that he had a steady customer who was a Colombian. At the end of the conversation, Barbosa told Disla that he would go to Aruba to get the drugs from Zorilla, if they were ready, and then return to New York City. Disla wanted Barbosa to come directly to Philadelphia, or to pick-up Barbosa at the airport in New York himself, but Barbosa declined both options.

Barbosa and Disla had a second recorded conversation later on July 13. During this call, Barbosa insisted on making all of his own travel arrangements out of New York. Shortly after this call, there was a third recorded conversation, during which Barbosa estimated that his expenses would be between $1,400 and $1,500. That night, Barbosa went to Philadelphia and received $1,600 from Disla.

Barbosa traveled to Aruba on July 15, 1998. He spoke to Salcedo on the telephone concerning the money Zorilla had requested that he bring to Aruba. During a recorded telephone conversation the next day, Barbosa told Disla that Zorilla had delivered the drugs to him, and that Zorilla and his girlfriend had stayed with him while he swallowed the drugs. On July 17, Disla and Salcedo picked-up Barbosa at JFK Airport in New York. This came as a complete surprise to Barbosa, as the two had previously agreed to meet elsewhere. Disla testified that he went to the airport because he did not trust Barbosa and was afraid that Barbosa would abscond with the drugs upon his arrival. Disla then drove them to the Hilton Hotel, near the Philadelphia airport. During the drive, Barbosa discussed

6

the potential drug deal in Israel and told Disla and Salcedo the specific foods and juices he would need to help him pass the drugs. Barbosa also told them that he would have no problem passing the drugs and that he did not need to be in any special place to complete this task.

The DEA had arranged for two adjoining rooms at the hotel. Disla's room contained video surveillance equipment, which could record activity in Barbosa's room next door. At various times, there were four people present -- Barbosa, Disla, Salcedo, and Morel. During one of their videotaped conversations, Barbosa asked Disla about a drug deal that Disla had told him about during their meetings at La Familia. Although it was not recorded on videotape, Salcedo also had a conversation with Barbosa in which Barbosa explained that he knew a lot about swallowing, that he trained other people, and that he watched the trainees all the time, going so far as to sleep by their side until they were ready to swallow drugs on their own.

Barbosa began expelling the drugs almost as soon as they had all arrived at the hotel. At one point, he showed Morel thirty pellets of drugs that he had expelled, explaining that the drugs had not been packaged properly. Barbosa finished eliminating the drugs the next morning. He asked Disla for a razor to help cut the covering off the drugs and peel open the pellets. While he was doing this, the agents entered the room and arrested him.

After the arrest, Morel traveled to Aruba to pay for the drugs Barbosa had transported, as well as to purchase an additional four kilograms of heroin from Zorilla. Morel called Zorilla and arranged to meet with him the following day. Aruban authorities arrested Zorilla with 75 kilograms of cocaine at the prescribed meeting place.

B.

On August 13, 1998, a grand jury indicted Barbosa on one count of possession with intent to distribute more than 50 grams (i.e., 882 grams) of cocaine base in violation of 21 U.S.C. SS 841(a) and 841(b)(1)(A)(iii). Before trial, Barbosa moved to dismiss the indictment based upon the Government's allegedly outrageous conduct. He contended

7

that the Government had orchestrated the entire narcotics transaction and had unnecessarily placed his life in danger from the ingested drugs. At oral argument before the District Court, the Government conceded that swallowing drugs and transporting them was dangerous but argued that it was not "unusually dangerous" because Barbosa knew how to package and swallow drugs, and, in any event, there was always risk involved in any drug transaction. The District Court denied Barbosa's motion, holding that, in the absence of duress or coercion forcing Barbosa to swallow the drugs, and considering Barbosa's willing undertaking of what was for him not a new experience, the Government's conduct did not "shock the conscience of one with a reasonably sensitive conscience."

A five-day jury trial began on January 25, 1999. At the conclusion of the Government's case, Barbosa again moved for dismissal of the indictment on the same ground, expanding the motion based upon the trial testimony. The District Court again denied the motion, emphasizing that Barbosa was willing to engage in such conduct, that there was no evidence of duress, and that Barbosa did not appear to be apprehensive in the hotel room.

Barbosa then testified in his own defense. He essentially interposed an entrapment defense, claiming that he had been badgered by Disla into undertaking the smuggling from Aruba to Philadelphia. According to Barbosa, it was only after repeated prodding from Disla that he had gone to Aruba and met with Zorilla for the drug transaction. He testified that he had not participated in the packaging of the drugs but simply received the pellets from Zorilla. He spent the night swallowing the pellets, and Zorilla had stayed with him the entire time. Barbosa agreed that he was knowledgeable about the price of heroin in Aruba but claimed that he knew this information from watching the news on television. Finally, Barbosa stated that, although he might have made incriminating statements to the Government after his arrest, he could not recall doing so.

C.

The District Court instructed the jury on the one count of possession with intent to distribute cocaine base charged

in the indictment. However, the court submitted neither the quantity nor identity of the drugs for a factual determination. The jury thereafter convicted Barbosa of the one count in the indictment. Sentencing then presented novel issues for the District Court's resolution. While all parties had fully expected that Barbosa was transporting heroin, he had unwittingly swallowed a form of cocaine base. None of the parties was ever able to determine when the "bait and switch" occurred. This mutual mistake of fact presented to the District Court the threshold issue under the Sentencing Guidelines of whether Barbosa should be sentenced for the drug he actually transported or the one he reasonably believed he was carrying.

The resolution of this issue has a substantial impact on the potential sentence. Assuming a criminal history category of III (which neither party disputes), Barbosa's sentencing ranges for 882 grams of a controlled substance are 121-151 months for heroin and 235-293 months for cocaine base.2 However, with a prior felony drug conviction, Barbosa is subject to statutory mandatory minimums of ten years for heroin and twenty years for cocaine base. See 21 U.S.C. SS 841(b)(1)(B)(i) (heroin), 841(b)(1)(A)(iii) (cocaine base).

In the District Court, Barbosa maintained that he should be held responsible for the intended or foreseeable consequences of his criminal conduct under U.S.S.G. S 1B1.3. He further attempted to distinguish his case from others in which an accused had maintained that he thought he was delivering a more moderately punished drug than that with which he was caught. Thus, he

_____

2. Without objection, the District Court used the November 1, 1998 edition of the Sentencing Guidelines in this case. All sentencing ranges were based on base offense levels found in U.S.S.G.S 2D1.1(c). As detailed in the Presentence Investigation Report, the Probation Office increased Barbosa's offense level by two for obstruction of justice (again with no objection), which would have resulted in adjusted ranges of 151-188 for heroin and 292-365 for cocaine base. Because the District Court imposed a sentence of 240 months, and the record is otherwise silent as to this two-level enhancement, we assume that the District Court implicitly rejected this recommendation in imposing its ultimate sentence.

9

contended that the proper sentencing range was 121–151 months for heroin, which already accounted for the ten-year mandatory minimum applicable to that drug. Alternatively, Barbosa argued that, if he were to be held responsible for the actual drug transported, he should be subject to the ten-year mandatory minimum sentence for cocaine because the Sentencing Guidelines define "cocaine base" only to be crack, relegating all other forms of cocaine base (like the 85% pure mixture here) to "cocaine." Notably, the federal drug statutes themselves provide no similarly delineated definition for "cocaine base." The Probation Office concurred with Barbosa's alternative position, recommending a sentencing range of 120–121 months for cocaine (after imposing the two-level enhancement for obstruction of justice).3

On June 8, 1999, after thoroughly canvassing existing case law and conducting a sentencing hearing, the District Court concluded that Barbosa should be sentenced for the drug he actually transported. The court further determined that the Sentencing Guidelines' definition of "cocaine base" could not override the statute, and thus, applied the twenty-year mandatory minimum, resulting in an adjusted sentencing range of 240–293 months (again, omitting the two-level enhancement for obstruction of justice). The District Court ultimately imposed the statutory minimum, or 240 months.

D.

Barbosa thereafter filed a timely notice of appeal, and we issued a briefing and scheduling order. Before the filing date of his opening brief, however, Barbosa's counsel fortuitously learned that, before the commencement of the trial, Disla had been nominated for a $25,000 reward

_____

3. With a criminal history category of III, Barbosa's sentencing range for 882 grams of cocaine was 78–97 months or 97–121 months after imposing a two-level enhancement for obstruction of justice. The Probation Office modified these ranges by the statutory mandatory minimum of ten years to either 120 months or 120–121 months, respectively. See U.S. Sentencing Guidelines Manual SS 5G1.1(b), (c) (1998).

10

because of his efforts in the overall investigation. Defense counsel also learned that Morel had received a $25,000 reward for his similar efforts, and that Disla had received an additional $500 payment only three days after the conclusion of the trial. The Government had not previously disclosed either the nominations or the payments to the defense because it was unaware of them. Defense counsel moved to remand the case to the District Court for a new trial hearing under Federal Rule of Criminal Procedure 33 based upon newly discovered evidence. We granted the motion.

On February 24, 2000, the District Court conducted a hearing in which Disla, Morel, and DEA Agents Philip Devlin and Michael Machak testified. In October 1998, Agent Devlin had nominated both informants for the $25,000 reward. Although both Disla and Morel knew that they had been nominated for the award, they were not aware of the amount of the award, and the DEA had told them both that the awards were not guaranteed. The nominations were later approved, and both informants received $25,000 in April 1999. Disla also received an additional $500 payment no more than two days after Barbosa's trial.

In a written opinion, the District Court denied Barbosa's motion for a new trial. The court found that all testimony concerning the payments received by Disla and Morel was true and that, while, at the time, the payments had been speculative rather than certain, the possibility of payments should have been disclosed to the defense. Nonetheless, the court went on to find that the payments were not primarily for Barbosa's case, but rather for the larger 75-kilogram seizure in Aruba; that the payments were for investigations and not trials; that the $25,000 payments were not made in exchange for any testimony; and that the $500 payment after the trial was for information provided during intensive trial preparation. The court further found that any impeachment value attributable to these payments would have been cumulative, would not have been material to the issue of entrapment, and that, in view of the overwhelming evidence against Barbosa, would not have led to an acquittal.

11

The District Court exercised jurisdiction over this case under 18 U.S.C. S 3231, and we have appellate jurisdiction under 28 U.S.C. S 1291 and 18 U.S.C. S 3742.

II.

Barbosa initially challenges the propriety of being sentenced based upon the cocaine base he unwittingly, but actually, transported. The difference is meaningful as the sentencing schemes for a particular amount of cocaine base are generally heavier than for an equivalent amount of heroin, the drug he intended to bring into this country. This mutual mistake of fact as to the identity of the drugs transported by Barbosa (the Government also believed it was heroin) presents us with an issue of first impression in this Circuit: whether a defendant should be sentenced for the drug he actually transported or for the drug he reasonably believed he was carrying.

A.

We have previously held that the sentencing judge is generally empowered to determine the identity of the controlled substance at issue for sentencing purposes. See United States v. Lewis, 113 F.3d 487, 490 (3d Cir. 1997); see also Edwards v. United States, 523 U.S. 511, 513-14 (1998). Consequently, like other federal appellate courts that have addressed the instant issue, we would ordinarily resolve the tension between these two conflicting theories of punishment by characterizing it as a legal determination to be made by the sentencing judge. In fact, federal appellate courts have uniformly ruled that a defendant should be held accountable for the substance he actually imported, notwithstanding his reasonable mistake as to drug identity. See, e.g., United States v. Strange, 102 F.3d 356, 361 (8th Cir. 1996) ("it is certainly within the province of Congress to resolve that there is some deterrent value in exposing a drug trafficker to liability for the full consequences, both expected and unexpected, of his own unlawful behavior"); United States v. Salazar, 5 F.3d 445, 446 (9th Cir. 1993) (defendant "personally undertook to pass drug-laden vehicles through the checkpoint . . . [and thus, he] is

12

responsible for the drugs that came through, even if he did not know what drugs they were"); United Sates v. Gomez, 905 F.2d 1513, 1514-15 (11th Cir. 1990) ("those who, acting with deliberate anti-social purpose in mind, become involved in illegal drug transactions, assume the risk that their actions will subject them to enhanced criminal liability"); see also U.S. Sentencing Guidelines Manual S 1B1.3, cmt. n.2, illus. (a)(1) (1998) (suggesting that a defendant is chargeable at sentencing for any narcotic with which he was directly involved "regardless of his knowledge or lack of knowledge of the actual type or amount of that controlled substance").

For example, in United States v. Valencia-Gonzales, a case with facts similar to this one, the defendant believed -- and the Government stipulated to his belief-- that he was carrying cocaine when, in fact, he was carrying heroin, for which he received a longer sentence. The court affirmed the sentence, characterizing as "clear" the decision by Congress "to make drug dealers assume the risk of what kinds and amounts of controlled substances they carry." 172 F.3d 344, 345 (5th Cir. 1999). Similarly, in United States v. Obi, the defendant had swallowed heroin, but claimed at sentencing that he thought he had swallowed cocaine. In affirming the heavier sentence based upon heroin, the court stated that "narcotics violators run the risk of sentencing enhancements concerning other circumstances surrounding the crimes." 947 F.2d 1031, 1032 (2d Cir. 1991) (per curiam).

Barbosa contends that these cases are distinguishable because the conspiracies in those cases did not involve the kind of active participation by government agents that were present here. However, like the defendant in Gomez, Barbosa:

> knew he was engaging in conduct designed to introduce some illegal substance into the stream of commerce. He was doing this at the behest of two individuals whom, he claimed, he hardly knew. Yet he lacked even the minimal consideration for the public welfare that would have caused him to determine the substance's true identity before agreeing to transport it. One who demonstrates a lack of even this minimal

13

> societal consciousness shows himself to pose an
> alarming menace to the public safety, because he
> readily allows himself to become the instrument for
> others' criminal designs "so long as the price is right."

905 F.2d at 1515. While Barbosa was unable to tell Zorilla how the drugs should be packaged, the record does not reveal that he was thereafter concerned in any way as to how the drugs were presented or even as to the amount or identity of the narcotic he would be ingesting. Thus, the rationale in Gomez would amply support the enhanced penalties dictated by the Sentencing Guidelines, and adherence to that rationale would properly penalize Barbosa for the full consequences of his illegal activity. We agree.

B.

Notwithstanding the persuasive and uniform decisions of the Second, Fifth, Eighth, Ninth, and Eleventh Circuits, Barbosa draws our attention to the Supreme Court's recent pronouncement in Apprendi v. New Jersey, 530 U.S. 466 (2000), and contends that the issue of which substance he intended to transport should have been submitted to the jury for a factual determination beyond a reasonable doubt. According to Barbosa, this error warrants a vacatur of his conviction and a new trial. We requested supplemental briefing after oral argument on the novel issue of drug identity.

The application of Apprendi to this case is a pure question of law over which we exercise plenary review. United States v. Williams, 235 F.3d 858, 861 (3d Cir. 2000), petition for cert. filed, 69 U.S.L.W. 3763 (U.S. 2001). Apprendi involved the New Jersey hate crime"sentence enhancement" scheme, which, in the first instance, allowed a jury to convict a defendant of a second-degree offense based upon its finding beyond a reasonable doubt that he unlawfully possessed a prohibited weapon. After a subsequent and separate proceeding, the scheme then permitted a judge to impose punishment identical to that provided for crimes of the first degree in New Jersey. This enhanced punishment was available upon the judge's

14

finding, by a preponderance of the evidence, that the defendant's "purpose" for unlawfully possessing the weapon was "to intimidate" the victim on the basis of a particular characteristic the victim possessed. See Apprendi, 530 U.S. at 491.

The Supreme Court initially canvassed prior case law and history to announce that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. It then endorsed the concept that, with the exception of recidivism, "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." Id. (internal quotations and citation omitted). Under these newly announced constitutional rules, the Court struck down the New Jersey scheme because the facts necessary to impose the enhancement amounted to an intent requirement, which the Court concluded "is perhaps as close as one might hope to come to a core criminal offense `element.' " Id. at 493.

In McMillan v. Pennsylvania, 477 U.S. 79 (1986), the Court first coined the term "sentencing factor" as distinct from an element of the crime, the former being something not found by a jury but affecting the sentence imposed by the judge. See id. at 485-86. By contrast, of course, every element of a crime must be proven to a jury beyond a reasonable doubt. See United States v. Gaudin , 515 U.S. 506, 510 (1995). In announcing the rule in Apprendi, the Court specifically noted that it was neither overruling McMillan nor rendering the term "sentencing factor" devoid of meaning. Compare 530 U.S. at 487 n.13 with id. at 494 n.19. Rather, the Court set forth the proposition that "[t]he judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed were [for the Sixth Amendment's framers] by definition `elements' of a separate legal offense." Id. at 483 n.10. Under Apprendi, sentencing factors that support a specific sentence within the statutorily prescribed penalty range are

15

still properly submitted to a judge to be found by a preponderance of the evidence. See id. Ultimately, a court may still consider aggravating and mitigating factors that support a specific sentence within the statutorily prescribed range when sentencing a defendant, so long as the sentence imposed is not greater than the maximum statutory penalty for the statutory offense established by the jury's verdict. See id.

Here, in its charge to the jury, the District Court read aloud the one-count indictment against Barbosa, which alleged that he:

> did knowingly and intentionally possess with intent to distribute 50 grams or more of a controlled substance. That is, approximately 882 grams of a mixture or substance containing a detectable amount of cocaine base, a Schedule II non-narcotic controlled substance, in violation of Title 21 United States Code Sections 841(a)(1) and (b)(1)(A)(iii).

The court further instructed the jury that, in order to prove this charge against Barbosa, the Government had to establish the following three elements beyond a reasonable doubt: "First: That the defendant possessed a controlled substance. Second: That the defendant knew that he possessed a controlled substance. And Third: That the defendant intended to distribute the controlled substance." Notwithstanding the fact that the indictment identified cocaine base as the controlled substance in this prosecution, the court expressly stated that:

> If you find that the material involved in this case is a controlled substance, you need not be concerned with the quantity or the identity of the controlled substance. So long as you find that the defendant knowingly possessed with intent to distribute a controlled substance, the amount and the identity of the controlled substance involved is not important.

The jury subsequently returned a general guilty verdict "in the manner and form as [Barbosa] stands indicted." However, drug identity was ostensibly not submitted to the jury for a factual determination. Hence, we are faced with a potential Apprendi issue: whether drug identity was an

16

element of the crime that the District Court should have presented to the jury to find beyond a reasonable doubt or merely a sentencing factor that the court properly found by a preponderance of the evidence standard. Should we conclude that drug identity is an element of the drug trafficking offense, a secondary inquiry is whether the defendant's intent (or lack of intent) to traffic in that particular drug is yet another fact that the jury was bound to find. This latter point is the crux of Barbosa's claim in this appeal.

Before beginning our analysis, we note that Barbosa did not timely object to the indictment or the jury instructions because the Supreme Court decided Apprendi long after he was sentenced. Thus, his counsel could hardly have known at that time that his client may have had a constitutional right to have drug identity determined by a jury. Apprendi nonetheless applies retroactively because Barbosa's direct appeal was pending at the time the Court decided Apprendi. See id. (citing and quoting Griffith v. Kentucky, 479 U.S. 314, 328 (1987)). Under these circumstances, Federal Rule of Criminal Procedure 52(b) limits our review to one for plain error only. Under that doctrine, "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights." Johnson v. United States, 520 U.S. 461, 466–67 (1997) (internal quotations and citation omitted). The deviation from a legal rule is "error," and an error is "plain" if it is "clear" or "obvious." United States v. Olano, 507 U.S. 725, 732–34 (1993). Furthermore, in most cases, an error affects substantial rights if it is prejudicial, i.e., "affected the outcome of the district court proceedings." Id. at 734. We are empowered in our discretion to correct the forfeited error, but we should not exercise that discretion unless "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Johnson , 520 U.S. at 467 (internal quotations and citation omitted). Moreover, unlike a harmless error analysis, the defendant bears the burden of demonstrating that the error was prejudicial. See Olano, 507 U.S. at 734. Our first step then is to determine whether there indeed was an error, or Apprendi violation.

We begin with a close examination of the federal drug

trafficking laws. Congress separated controlled substances into five drug schedules, which are updated and republished on an annual basis. See 21 U.S.C. SS 802(6), 812(a). Among other provisions, the drug laws make it unlawful "for any person knowingly or intentionally -- (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Id. S 841(a)(1). Thus, on its face, the identity of the controlled substance is not an element of the statutory offense. Rather, in the immediately following section, Congress enumerated numerous potential penalties for violating S 841(a), depending upon facts such as drug quantity and drug identity. See generally id. S 841(b). Congress also provided for several "catch-all" provisions, all of which generally contain no reference to specific drug quantity or drug identity, except by schedule number. See, e.g., id. S 841(b)(1)(C) ("In the case of a controlled substance in schedule I or II . . ."); id. S 841(b)(1)(D) (". . . in the case of any controlled substance in schedule III . . ."); id. S 841(b)(2) ("In the case of a controlled substance in schedule IV . . ."); id. S 841(b)(3) ("In the case of a controlled substance in schedule V . . ."). The maximum penalties under these "catch-all" provisions range from one year (schedule V) to twenty years (schedules I and II). If the defendant has a prior felony drug conviction, the maximum penalties are enhanced to a range of two years to thirty years, respectively.4 Thus, because a defendant would be exposed to greater punishment depending upon a factual finding regarding the identity of the controlled substance, it is conceivable, under the teachings of Apprendi , that drug identity is an element of a S 841(a) offense, and therefore, generally must be submitted to the jury and found beyond a reasonable doubt.

Here, the District Court read to the jury the contents of

_____

4. Under some circumstances, the maximum penalty under a given combination of quantity and identity of a controlled substance can make a defendant eligible for a life sentence. See , e.g., 21 U.S.C.A. S 841(b)(1)(A). Additionally, under 21 U.S.C.S 841 (b)(1)(B), if a defendant
has previously committed a felony drug offense, other combinations of quantity and identity of a controlled substance would make him eligible for a life sentence as well.

18

the indictment, which explicitly alleged cocaine base as the controlled substance at issue. But immediately thereafter, the court expressly circumscribed the jury's deliberations by admonishing it from considering either the amount or identity of the controlled substance. Thus, the jury only conclusively found that Barbosa trafficked in a controlled substance, without any finding as to a particular controlled substance or the amount at issue.

That said, Barbosa himself does not challenge drug quantity on this appeal, and thus, in light of this waiver, we will accept the amount presented at trial, which was 882 grams. See Nagle v. Alspach, 8 F.3d 141, 143 (3d Cir. 1993) ("When an issue is either not set forth in the statement of issues presented or not pursued in the argument section of the brief, the appellant has abandoned and waived that issue on appeal.") (citations omitted); But, as the "catch-all" provisions above demonstrate, Congress did not enact a general provision for situations in which drug quantity is known but drug identity is not. Thus, under the facts found by the jury, we cannot unequivocally determine which of the "catch-all" provisions to invoke against Barbosa. Only under the "catch-all" provision for a schedule I or II controlled substance would Barbosa's twenty-year sentence be within the prescribed statutory maximum. See 21 U.S.C. S 841(b)(1)(C) (authorizing maximum of twenty years; thirty years with prior felony drug conviction). Under the other three provisions, his sentence far exceeds the maximum permitted under the statute. See 21 U.S.C.SS 841(b)(1)(D), (b)(2), (b)(3). We would reach the same outcome even if we were to include any enhancement for Barbosa's prior felony drug conviction.

In the face of this ambiguity, we would apply the rule of lenity to Barbosa (notwithstanding his failure to raise this issue) and conclude that an Apprendi violation has been established. See Staples v. United States, 511 U.S. 600, 619, n.17 (1994) (rule of lenity requires that "ambiguous criminal statute[s] . . . be construed in favor of the accused"). The rule of lenity is applicable when there is a "grievous ambiguity or uncertainty in the language and structure of the [statute]." Huddleston v. United States, 415 U.S. 814, 831 (1974). The ambiguity must be such that,

19

even after a court has " `seize[d] every thing from which aid can be derived,' " it is still "left with an ambiguous statute." United States v. Bass, 404 U.S. 336, 347 (1971) (quoting United States v. Fisher, 2 Cranch 358, 386 (1805)). "The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." Callanan v. United States, 364 U.S. 587, 596 (1961). Thus, except for S 841(b)(1)(C) and its thirty-year statutory maximum, Barbosa can establish an Apprendi violation because the identity of the controlled substance is a fact that increased his penalty beyond the prescribed statutory maximums in the other three penalty provisions. Cf. United States v. Vazquez, 2001 WL 1188250, *1 (3d Cir. 2001) (finding Apprendi violation where the district court sentenced the defendant to a term in excess of the default statutory maximum for powder cocaine based upon its own factual finding of drug quantity).

In an attempt to sidestep this result, the Government argues in its brief that, if the quantity of drugs were to be disregarded, Barbosa would be subject to a statutory maximum of thirty years, irrespective of whether the drug was heroin or cocaine base (the only controlled substances presented to the jury through the evidence at trial), because both heroin and cocaine base are schedule I or II controlled substances. See 21 U.S.C. SS 802(6), 812 (Schedules I(b)(10) and II(a)(4)), 841(b)(1)(C). Thus, according to the Government, Barbosa's twenty-year sentence is less than the statutory maximum, rendering Apprendi inapplicable. Alternatively, in its letter brief following oral argument, the Government relies upon another line of cases that permit us to infer facts from the jury's verdict. See, e.g., United States v. Boggi, 74 F.3d 470, 478-79 (3d Cir. 1996) (holding that, in convicting the defendant, the jury implicitly rejected as false the defendant's exculpatory testimony, thus laying the groundwork for an obstruction of justice enhancement at sentencing). According to the Government, the fact that Barbosa possessed cocaine base was "necessarily and finally decided" by the jury in convicting him of the substantive offense, and thus, there can be no question that the jury made a finding that he possessed cocaine base.

20

We cannot countenance either of the Government's lines of analysis to determine whether an Apprendi violation has occurred because it amounts to an ill-advised effort to define away the applicability of Apprendi to this case. The Government fails to appreciate that, because the identity of the drug was not submitted to the jury, we cannot simply assume that only schedule I and II controlled substances are implicated merely because the evidence was so constrained. Apprendi compels us to focus on the permissible sentences authorized by the jury's verdict, which, in this case, contained no factual finding as to drug identity. Moreover, with respect to its argument pertaining to S 841(b)(1)(C), the Government only further complicates the issue by introducing a new variable and urging us to disregard the quantity of drugs. Both parties agree that Barbosa intended to import approximately one kilogram of a controlled substance, and no party disputes the 882-gram amount that was ultimately seized by the DEA agents. As we will make apparent, however, where the Government's arguments have merit is in their applicability to the substantial rights inquiry of the plain error analysis.

We hold that, under the circumstances of this case, an Apprendi violation has occurred and that it was plain. The jury convicted Barbosa without having the issue of drug identity submitted for its consideration. Barbosa's twenty-year sentence far exceeded the statutory maximums under the potentially applicable "catch-all" provisions (after judicial application of the rule of lenity) because of the District Court's drug identity determination. Cf. Vazquez, 2001 WL 1188250, at **4-5 (holding that defendant had established a plain Apprendi violation with respect to drug quantity). Other federal appellate courts have similarly concluded that the failure to submit drug identity for a jury determination may violate Apprendi. See, e.g., Horton v. United States, 244 F.3d 546, 552 (7th Cir. 2001); United States v. Robinson, 250 F.3d 527, 529 (7th Cir. 2001); cf. United States v. Keith, No. 00-4820, 2001 WL 575143, at *1 (4th Cir. May 29, 2001) (unpublished).

Our prior jurisprudence on this point, however, is to the contrary. Before Apprendi, we had held that drug identity under S 841(a) was merely a sentencing factor to be

21

determined by the court, not an element of the offense subject to a jury finding. See United States v. Lewis, 113 F.3d 487, 490 (3d Cir. 1997) (stating that an indictment need not identify the controlled substance at issue because drug identity is a factor for sentencing and not an element of the offense); cf. United States v. Gibbs, 190 F.3d 188, 205-06 (3d Cir. 1999) (holding that the district court's drug identity finding was not clearly erroneous), cert. denied sub nom. Sydnor v. United States, 529 U.S. 1030 (2000). Therefore, we acknowledge that Apprendi has eroded the precedential value of our prior decisions. However, we do not overrule them completely because, even after Apprendi, drug identity will not always be an element of aS 841(a) offense because of the inherent ambiguity in choosing amongst several potentially applicable "catch-all" provisions. Under Apprendi, drug identity must be treated as an element only when it results in a sentence beyond the relevant statutory maximum. Apprendi therefore does not necessarily preclude a sentencing judge from determining the drug identity involved in a S 841 offense or considering it as relevant conduct under the Sentencing Guidelines using a preponderance of the evidence standard. So long as the resulting, and possibly enhanced, sentence is below the statutory maximum authorized by the jury's factual findings, no Apprendi problem exists and drug identity need not be treated as an element of the offense. See, e.g., Vazquez, 2001 WL 1188250, at **3-7 (holding that, post-Apprendi, drug quantity is only an element of a S 841 offense when a defendant is sentenced above the default statutory maximum, thus only overruling prior decisions to the extent that they establish that drug quantity is never an element).5 Specifically, drug identity would not be an element in those cases where the sentence imposed is below the lowest "catch-all" maximum of one year found in S 841(b)(3), which corresponds to Zone A and Zone B in the Sentencing Table. See U.S. Sentencing Guidelines Manual ch.5, pt. A (1998).

---

5. It should be noted that while Chief Judge Becker joins the majority in this case, he had not joined in the portion of Vazquez relevant here, but rather wrote separately, opining that drug quantity and identity are always elements, even when the sentence is below the maximum.

22

C.

The foregoing conclusion gives us pause to consider, as a secondary matter, whether Barbosa's lack of intent to traffic in cocaine base, brought about because of his mistake of fact concerning drug identity, would be yet another fact that the jury was bound to find under the teachings of Apprendi. We understand Barbosa to be arguing that, once the application of Apprendi makes drug identity an element of the offense, a defendant must also have knowledge of the precise controlled substance at issue before he can be convicted under S 841(a)(1). Here, both Barbosa and the Government agree that Barbosa's knowledge and intent related only to heroin. Thus, the Government introduced no evidence of Barbosa's knowledge or intent concerning cocaine base because none existed. On that basis, according to Barbosa, his conviction cannot stand because the jury did not find that he knowingly possessed cocaine base and, in fact, could not have made such a finding based upon the evidence adduced at trial. Indeed, Barbosa presents us with the perplexing problem of a defendant who was found to have possessed cocaine base but with the intent to distribute heroin. The resolution of this inquiry turns once again upon statutory construction.

In relevant part, the statutory proscription reads:". . . it shall be unlawful for any person knowingly or intentionally -- (1) to . . . possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. S 841(a)(1). Under a plain reading of this statute, if the identity of the controlled substance creates separate legal offenses under an Apprendi analysis, then the issue for this Court is whether the defendant's mens rea concerning that particular controlled substance must also be construed as an inherent part of each offense as well.

To act "knowingly" is to act with "knowledge of the facts that constitute the offense" but not necessarily with knowledge that the facts amount to illegal conduct, unless the statute indicates otherwise. Bryan v. United States, 524 U.S. 184, 193 (1998). A contrary interpretation would be tantamount to compelling the Government to disprove an ignorance of the law defense. See, e.g., United States v. Cain, 130 F.3d 381, 384 (9th Cir. 1997). Moreover, "to

23

commit an act intentionally is to do so deliberately and not by accident." United States v. Fuller, 162 F.3d 256, 260 (4th Cir. 1998).

Thus, under the mens rea requirement, the Government must prove the defendant's awareness that he engaged in one or more of the active verbs in that provision: manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense. It is not a requirement, however, that the defendant have specifically intended to violate the statute in order to be found guilty. Additionally, it is well settled that the Government must show that the defendant knew that the substance in which he trafficked was a controlled substance. See, e.g., United States v. Kim, 27 F.3d 947, 959 (3d Cir. 1994); cf. United States v. Dodd, 225 F.3d 340, 344 (3d Cir. 2000) (similarly analyzing analogous mens rea requirement in felon-in-possession firearm statute).

We believe that the structure of the drug statutes and the policies behind them show that the Government's mens rea burden has not changed with the advent of Apprendi. Under Apprendi, drug identity may now be a separately delineated element of the offense, but that conclusion alone does not lead to the inevitable result that the Government must prove the defendant's knowledge of that fact. The drug statutes require specific knowledge or intent as to a general category of unlawful items. The specific unlawful items, however, are found in the penalty section of the scheme. Thus, the structure and plain text of S 841 affords no support for a requirement that the Government must prove more than the defendant's knowledge that he was trafficking in a controlled substance. See United States v. Lewis, 113 F.3d 487, 491 (3d Cir. 1997) ("While Congress could have enacted separate statutes criminalizing the distribution of particular controlled substances, it did not do so. Instead, it characterized the determination of the identity and the weight of the controlled substance as penalty factors in section 841(b). We must honor that approach."). Moreover, we see no reason, consistent with Congress' overall intent in promulgating the drug laws, to extend the mens rea requirement to the precise controlled substance at issue, even in the face of having concluded

24

that it may be an element of the crime. Barbosa's awareness that he was trafficking in what he believed was a controlled substance, albeit a different type for which he was arrested, is all that is required to satisfy the mens rea portion of the substantive offense.

We appreciate the somewhat anomalous result in having provided more specificity to an existing element in S 841(a)(1) to which the mens rea requirement applies, while, at the same time, refusing to apply that requirement to the newly specified element. But to construe the statute otherwise would entail making drastic revisions to a statutory scheme, which, in the first instance, lies in the hands of Congress. By concluding that drug identity may be an element of the offense, we are not rewriting S 841(a)(1) so as to eliminate any of the text. We are only making the specific controlled substance an additional element that may have to be submitted to the jury for a factual finding beyond a reasonable doubt, if the facts warrant it. Otherwise, we would in essence be striking the term "controlled substance" from the text ofS 841(a)(1). Thus, we leave undisturbed our jurisprudence with respect to the mens rea requirement, which only requires the Government to prove the defendant's knowledge that he was trafficking in a controlled substance.

Barbosa alternatively urges us to adopt the evidentiary mechanism suggested by Judge Weinstein in United States v. Cordoba-Hincapie, 825 F. Supp. 485 (E.D.N.Y. 1993). In that case, Judge Weinstein proposed a burden-shifting mechanism for mistake of fact cases. In brief, he held that the sentencing court should presume that the defendant was aware of the type of narcotics he was carrying but should afford him the opportunity to rebut this presumption by introducing evidence at the sentencing phase. See id. at 531-32. However creative and facially palatable Judge Weinstein's solution may appear, we decline to adopt such a mechanism as the law in this Circuit for two main reasons. First, it is highly unlikely that Judge Weinstein's methodology survives the new constitutional rule announced in Apprendi. Indeed, it would be unwise for us to craft an evidentiary rule to supplant the teachings of a Supreme Court case that is directly on point.

25

And second, as we have discussed above, Judge Weinstein appears to be the lone voice of dissent against a backdrop of uniformity in the federal courts before the advent of Apprendi. We decline Barbosa's request to sail in such uncharted waters.

Accordingly, we now formally adopt the uniform and persuasive reasoning of pre-Apprendi federal appellate authority, which held essentially that a defendant who is in actual possession of a particular controlled substance, while intending to distribute another, may be punished for the drug with which he is found to be in possession. See, e.g., United States v. Valencia-Gonzales, 172 F.3d 344, 345 (5th Cir. 1999); United States v. Strange, 102 F.3d 356, 361 (8th Cir. 1996); United States v. Salazar, 5 F.3d 445, 446 (9th Cir. 1993); United States v. Obi, 947 F.2d 1031, 1032 (2d Cir. 1991) (per curiam); United Sates v. Gomez, 905 F.2d 1513, 1514-15 (11th Cir. 1990).

D.

Having concluded that an Apprendi violation has occurred with respect to drug identity, we now turn to the substantial rights inquiry under the plain error analysis. As we explained in Vazquez, we rely upon Neder v. United States, 527 U.S. 1 (1999), and Johnson v. United States, 520 U.S. 461 (1997), in conducting this inquiry because both decisions concerned the failure of the trial court to instruct the jury as to an element of the offense charged. See Vazquez, 2001 WL 1188250, WL, at **5-8 . As the Supreme Court made clear in Neder, "an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." 527 U.S. at 9. Despite the occurrence of an Apprendi violation here, because drug identity was not submitted to the jury, under Neder, "the question remains whether [Barbosa's] conviction can stand because the error was harmless." Id. at 15. The test for whether a constitutional error is harmless "is whether it appears `beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " Id. (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). That is, we must limit our inquiry to

26

"whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." Id. at 19. "If, at the end of the examination, [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error-- for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding -- [we] should not find the error harmless." Id.

Under this standard, Barbosa cannot show that the error affected his substantial rights. The evidence at trial established indisputably, and certainly beyond a reasonable doubt, that Barbosa possessed with the intent to distribute 882 grams of a controlled substance and that this controlled substance was cocaine base. The Government presented three government informants, numerous tape-recorded conversations, and Barbosa's own confession all demonstrating that Barbosa was a drug smuggler who made contact with a supplier in Aruba to transport approximately one kilogram of a controlled substance into the United States through swallowing. For his part, Barbosa did not contest that he had violated S 841(a)(1), but rather, only interposed an entrapment defense.

Before trial, Barbosa and the Government believed the drug at issue to be heroin. But later chemical analysis revealed the controlled substance to be cocaine base with a purity of 85%. Indeed, cocaine base and heroin were the only controlled substances presented to the jury through the evidence at trial, the former through the testimony of the DEA forensic chemist. Nonetheless, we may confidently infer that the jury, in convicting Barbosa and rejecting the entrapment defense, necessarily found the controlled substance to be cocaine base. While evidence of heroin was presented by the testimony, it is undisputed that Barbosa was arrested while in possession of cocaine base, the very same controlled substance he had swallowed in Aruba two days earlier. We are convinced that a properly instructed jury would have come to no other conclusion than that the controlled substance at issue in this prosecution was cocaine base.

We need not even make that inference, however, because Barbosa himself only raises the applicability of the

27

provisions for heroin and cocaine base. These provisions mandate a term of imprisonment of five to forty years for 882 grams of heroin and ten years to life for an equivalent amount of cocaine base. Because Barbosa has a prior felony drug conviction (a fact that need not have been submitted to the jury under Apprendi), the same statutory provisions also set forth enhanced punishments of ten years to life for heroin and twenty years to life for cocaine base. Compare 21 U.S.C. S 841(b)(1)(B)(i) with id. S 841(b)(1)(A)(iii). Thus, irrespective of which of the two drugs the jury could have found, Barbosa's twenty-year sentence falls well below the prescribed statutory maximum of life for either heroin or cocaine base. Accordingly, we conclude that Barbosa's substantial rights were not affected. See United States v. Cepero, 224 F.3d 256, 267 n.5 (3d Cir. 2000) (en banc) (teachings of Apprendi irrelevant where application of Sentencing Guidelines did not implicate a fact that would increase the penalty of crime beyond statutory maximum), cert. denied , 531 U.S. 1114 (2001); United States v. Mack, 229 F.3d 226, 235 n.12 (3d Cir. 2000) (Apprendi does not apply where statutory maximum is life imprisonment), cert. denied, 121 S. Ct. 2015 (2001).

Even if Barbosa could somehow satisfy the third plain error prong, the Apprendi violation here did not seriously affect the fairness, integrity, or public reputation of judicial proceedings. On this point, we rely on the Supreme Court's decision in Johnson, which, like Neder , addressed a failure to submit an element for a jury's determination but did so in the context of the fourth plain error prong. In Johnson, the Supreme Court held that, when evidence of an element wrongly taken from a jury "overwhelming[ly]" supports the trial court's finding with regard to that element,"there is no basis for concluding that the error `seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings,' " and therefore plain error relief is unavailable. 520 U.S. at 470.

In this case, we think it clear that the evidence we recited above in the context of the third plain error prong constitutes overwhelming evidence that Barbosa possessed with the intent to distribute 882 grams of a controlled

28

substance and that the controlled substance was cocaine base. Because his sentence would not have been any different, there is no reasonable basis upon which to conclude that the fairness, integrity, or public reputation of judicial proceedings were seriously affected. See United States v. Mietus, 237 F.3d 866, 875 (7th Cir. 2001); United States v. Nance, 236 F.3d 820, 825-26 (7th Cir. 2000), petition for cert. filed, No. 00-9633 (U.S. Apr. 24, 2001); United States v. Keeling, 235 F.3d 533, 539-40 (10th Cir. 2000), cert. denied, 121 S. Ct. 2575 (2001); United States v. Swatzie, 228 F.3d 1278, 1284 (11th Cir. 2000), cert. denied, 121 S. Ct. 2600 (2001). Accordingly, we hold that, while Barbosa's sentence violated Apprendi, the error did not affect his substantial rights or the fairness, integrity, or public reputation of judicial proceedings, and thus, we uphold his twenty-year sentence. Cf. Vazquez, 2001 WL 1188250, at *10 (declining to notice the Apprendi violation under the fourth plain error prong because "of the undisputed evidence of drug quantity attributable to[the defendant] and our determination that his sentence did not exceed the statutory maximum for the cocaine amount introduced at trial"). Under these facts, the District Court properly sentenced Barbosa based upon the controlled substance he actually brought into the United States, cocaine base.

III.

Our inquiry is not complete because of another wrinkle in the drug sentencing schemes. Although we have concluded that Barbosa should be sentenced based upon cocaine base -- the drug he actually transported -- Barbosa argues that this does not automatically mean that his sentence should be at least the twenty-year mandatory minimum for that drug. Rather, he contends that he should be subject to the ten-year mandatory minimum sentence for cocaine because: (1) there was no dispute that the substance he transported was not crack, and (2) the Sentencing Guidelines utilize the cocaine guideline for penalizing all forms of cocaine base other than crack, reserving the cocaine base penalties solely for crack. Again, the potential sentencing ranges are 240-293 months for cocaine base

and 120 months for cocaine. This challenge raises yet another issue of first impression in this Circuit, one that we have expressly reserved deciding at least twice. See United States v. Bennett, 100 F.3d 1105, 1111 n.4 (3d Cir. 1996); United States v. James, 78 F.3d 851, 858 (3d Cir. 1996). We exercise plenary review over legal questions involving the proper interpretation and application of the Sentencing Guidelines. United States v. Helbling, 209 F.3d 226, 243 (3d Cir. 2000), cert. denied, 531 U.S. 1100 (2001).

We begin with a brief explanation of the chemistry of cocaine and cocaine base, which is now established in the case law and which will provide some background for the ensuing discussion. The chemical compound with the scientific formula $C_{17}H_{21}NO_4$ is found naturally in the coca leaf. It is referred to chemically as "cocaine base" because it reacts with acids to produce a salt. The compound can be extracted from the coca leaf in the form of a paste. When the paste derived from the coca leaf is dissolved in hydrochloric acid (HCl) and water ($H_2O$), it creates a salt called cocaine hydrochloride, $C_{17}H_{22}ClNO_4$, whichis commonly known as powder cocaine or cocaine salt. This is the form of the drug that is usually processed for importation into the United States. Powder cocaine is water-soluble and may be ingested, snorted, or dissolved in a liquid and injected, but it cannot be smoked because it decomposes at the same temperature at which it evaporates. There are, however, several ways in which to convert powder cocaine back into a base. The most common method is to dissolve the powder in water ($H_2O$) and sodium bicarbonate or baking soda ($NaHCO_3$), and then to boil the mixture until it solidifies and dries. When dried, the resulting substance, commonly called"crack" or "crack cocaine," can be smoked and has the same chemical formula as the naturally occurring cocaine base. Other forms of cocaine base can be derived from powder cocaine using other chemical agents. The chemical compound $C_{17}H_{21}NO_4$, either in nature or upon conversion from cocaine hydrochloride, is a base, and its distinct physical forms, such as coca paste and crack, are chemically indistinguishable. See United States v. Robinson , 144 F.3d 104, 108 (1st Cir. 1998); United States v. Sloan , 97 F.3d 1378, 1381-82 (11th Cir. 1996); see also United States v.

30

Barbosa, 51 F. Supp. 2d 597, 601 (E.D. Pa. 1999); U.S. Sentencing Guidelines Manual S 2D1.1(c), Note (D) to Drug Quantity Table (1998) (" `Crack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form.").

At trial, the Government proved that Barbosa transported pellets containing cocaine base with a purity of 85% and conceded that the pellets did not contain crack. Under the Sentencing Guidelines applicable at the time of Barbosa's sentencing hearing, "cocaine base" had to be"crack" for a defendant to be sentenced to the higher guideline for cocaine base. See U.S. Sentencing Guidelines Manual S 2D1.1(c), Note (D) to Drug Quantity Table (1998) (" `Cocaine base,' for purposes of this guideline, means `crack.' "). This specific definition was promulgated by the Sentencing Commission through an amendment to the Sentencing Guidelines on November 1, 1993 and was subsequently approved by Congress. See U.S. Sentencing Comm'n, Notice, Amendments to the Sentencing Guidelines for United States Courts, 58 Fed. Reg. 27148, 27156 (May 6, 1993) (proposing amendment and explaining that forms of "cocaine base" other than "crack," such as coca paste, will be treated as "cocaine" even though they are, scientifically, forms of "cocaine base"); see also U.S. Sentencing Guidelines Manual supp. app. C, amend. 487 (1998). Because Barbosa transported a form of cocaine base different from crack, the Probation Office initially determined that the cocaine guidelines would provide for an imprisonment range of between 97 to 121 months (after imposing a two-level enhancement for obstruction of justice). However, due to Barbosa's prior felony drug conviction, Probation also subjected him to a statutory mandatory minimum sentence of ten years. See 21 U.S.C. S 841(b)(1)(B)(ii) (mandatory minimum for 882 grams of cocaine). This adjusted his applicable sentencing range to 120-121 months or simply 120 months without the obstruction of justice enhancement. See U.S. Sentencing Guidelines Manual SS 5G1.1(b), (c) (1998).

Notably, Congress itself did not define "cocaine base" as specifically as did the Sentencing Commission; in fact,

Congress chose to omit any definition of "cocaine base" within the drug statutes. Moreover, to this day, even after the approval of the Commission's amendment in November 1993, Congress has not seen fit to adopt any definition or similar delineation of "cocaine base," contrary or otherwise. Thus, we must address what "cocaine base" means under the drug statutes when applying the statutory mandatory minimum sentences. Or said more precisely, the issue is whether the Sentencing Commission's definition of "cocaine base" as meaning only the equivalent of crack should be adopted as the statutory meaning of that drug under 21 U.S.C. S 841(b)(1). The resolution of this issue is significant because, should we decline to restrict the definition of cocaine base under the statute in the manner prescribed by the Sentencing Commission, Barbosa would be subject to a mandatory minimum of twenty years, or 240 months, rather than 120 to 121 months. See 21 U.S.C. S 841(b)(1)(A)(iii) (mandatory minimum for 882 grams of cocaine base and a prior felony drug conviction).

Two circuits have reached opposite conclusions on this issue, initially basing their determinations on differing conceptions of statutory construction and ultimately finding themselves constrained by principles of stare decisis. The Second Circuit applied the broader definition of cocaine base to all forms of cocaine base, including crack. As the court stated in United States v. Jackson:

> It is apparent that Congress in imposing the enhanced penalties was concerned with the scourge of "crack." While we believe that Congress contemplated that "cocaine base" would include cocaine in the form commonly referred to as "crack" or "rock" cocaine, Congress neither limited the term to that form in the plain language of the statute nor demonstrated an intent to do so in the statute's legislative history. Congress used the chemical term "cocaine base" without explanation or limitation.

968 F.2d 158, 162 (2d Cir. 1992). In a later case addressing the Sentencing Commission's 1993 amendment, the Second Circuit held that the amendment could not override the court's earlier interpretation of the drug statute in Jackson as encompassing all forms of cocaine base, in the absence

32

of new guidance from Congress. See United States v. Palacio, 4 F.3d 150, 154-55 (2d Cir. 1993). Thus, while the court concluded that "the sentencing range under the Guidelines for defendants who possess cocaine base that is not crack will be significantly lowered" and deemed "the Commission's interpretation of section 2D1.1 in the amended commentary . . . authoritative with respect to the Guidelines," it doubted what effect, if any, that interpretation would have in construing the substantive meaning of the term in the criminal statute. Id.

By contrast, the Eleventh Circuit restricted the definition of cocaine base to crack only, in accordance with the Sentencing Commission's amendment. Initially, in United States v. Rodriguez, the Eleventh Circuit had held that the term "cocaine base," as used in S 2D1.1 of the Sentencing Guidelines, was not limited to crack but included all forms of cocaine base according to the term's scientific meaning. See 980 F.2d 1375, 1377-78 (11th Cir. 1992). But two years later, the Eleventh Circuit held in United States v. Munoz-Realpe that the statutory definition of"cocaine base" had been amended by the Sentencing Commission because Congress had permitted the amendment to become effective with no change, thereby implicitly adopting the definition. See 21 F.3d 375, 377 (11th Cir. 1994). In addressing its contrary result in Rodriguez, the court stated:

> We believe that the precedential force of our Rodriguez ruling has been eroded by subsequent Congressional action. . . . By allowing the amendment to take effect, Congress has given its imprimatur to the new definition of "cocaine base"; Congress indicated that it intends the term "cocaine base" to include only crack cocaine.

Id.6

In imposing the higher mandatory minimum sentence

---

6. In passing, we note that, although equally not binding on our disposition, the Probation Office adopted the Munoz-Realpe analysis in rejecting an objection by the Government to the Presentence Investigation Report on the issue of which mandatory minimum to apply in sentencing Barbosa.

upon Barbosa for cocaine base, the District Court concluded that the reasoning of Munoz-Realpe could not survive the Supreme Court's subsequent decision in Neal v. United States, 516 U.S. 284 (1996). In Neal , the Court rejected a claim that the Sentencing Commission's revision of S 2D1.1 of the Sentencing Guidelines required reconsideration of the Court's prior interpretation of a related statutory provision. See id. at 288-96. Specifically, the Court held that the Sentencing Commission's revised definition of "mixture or substance" could not overturn the Court's prior interpretation of those terms in an earlier case, Chapman v. United States, 500 U.S. 453, 461-68 (1991). The Court explained that, "[o]nce we have determined a statute's meaning, we adhere to our ruling under the doctrine of stare decisis, and we assess an agency's later interpretation of the statute against that settled law." Id. at 295.

While this analysis echoes the reasoning of the Second Circuit in Palacio because it too rested on the fundamental principle of stare decisis, it actually says nothing with respect to the proper level of deference accorded to the Sentencing Commission's interpretation. Indeed, the Supreme Court expressly acknowledged so. See id.  ("In these circumstances, we need not decide what, if any deference is owed the Commission in order to reject its alleged contrary interpretation."). As we will make apparent, we also need not opine on this thorny issue. All we understand Neal to stand for is the narrow and now unobjectionable proposition that a court must adhere to its prior decisions interpreting an act of Congress, even in the face of a later, contrary interpretation or definition issued by the Sentencing Commission. It does not address situations where the court has not previously determined a particular statutory construction to which the Commission's interpretation arguably applies.

Thus, as a threshold matter, we examine our precedent to see if we have previously opined on the construction of the term "cocaine base" under the statute. We have not expressly done so. In United States v. Roberson , we noted, for the first time, that, "[p]rior to 1993, the Sentencing Guidelines had not defined the term `cocaine base' in

34

S 2D1.1(c), and no court of appeals had held that this term referred only to `crack' and not to other forms of cocaine base." 194 F.3d 408, 414 (3d Cir. 1999) (citing cases). Interestingly, the only case cited in that opinion from this Circuit was United States v. Jones, in which one member of this panel concluded that "crack" is a "cocaine base," and additionally that, because the Sentencing Guidelines had a reasonable basis to differentiate between cocaine base and cocaine salt, both the drug statute and the Guidelines were not void for vagueness. See 979 F.2d 317, 320 (3d Cir. 1992). We further held in Roberson that the Commission's 1993 amendment overruled our prior constructions of S 2D1.1(c), such as in Jones, and that this change was substantive. See Roberson, 194 F.3d at 417. Significantly, however, we did not interpret the amendment as having foreclosed any particular construction of 21 U.S.C. S 841(b)(1), the statute at issue in this appeal.

Next, in United States v. James, we stated that "[w]e find the Munoz-Realpe analysis to be persuasive." 78 F.3d 851, 858 (3d Cir. 1996). However, we only utilized the Eleventh Circuit's reasoning to require the Government to prove, by a preponderance of the evidence, that the form of cocaine base sold by the defendant was actually crack before imposing the enhanced sentence for crack under the Guidelines. See id. at 857-58. Once again, we did not reach the question of statutory construction under 21 U.S.C. S 841(b)(1), expressly declining to address the question. See id. at 858.

Hence, we conclude that we are neither constrained by stare decisis in the same way as were the Second Circuit in Palacio and the Supreme Court in Neal, nor required to address the prospective effect of the intervening amendment on a prior decision of this Court as did the Eleventh Circuit in Munoz-Realpe. The limited proposition established in Neal then is inapplicable to our disposition of the issue because we must construe the statute for the first time, unencumbered by precedent. As we stated earlier, we have had neither the occasion nor the need to opine expressly on the analytical basis for the Munoz-Realpe decision until now.

35

Upon careful consideration of the different analytical techniques employed by the Second and Eleventh Circuits, we conclude that the reasoning of the Second Circuit in Jackson and Palacio is more consonant with our understanding of the power of the Sentencing Commission to amend, in any way, the substantive meaning of a criminal statute. Because of the Commission's amendment, sentences imposed under the Guidelines for defendants who possess crack will be higher than for defendants who possess other forms of cocaine base. This result necessarily follows because the Sentencing Commission's promulgation of amendments to its own Guidelines, once approved by and stamped with the imprimatur of Congress, is binding on sentencing courts. See Mistretta v. United States, 488 U.S. 361, 391 (1989) ("the Guidelines bind judges and courts in the exercise of their uncontested responsibility to pass sentence in criminal cases"); see also 28 U.S.C. S 994(p) (providing that Commission's amendments to Guidelines automatically become effective within prescribed time period absent modification or disapproval by Congress). The Commission's amendments to the Guideline commentaries are equally binding on sentencing courts. See Stinson v. United States, 508 U.S. 36, 46 (1993) ("Amended commentary is binding on the federal courts even though it is not reviewed by Congress, and prior judicial constructions of a particular guideline cannot prevent the Commission from adopting a conflicting interpretation that satisfies the standard we set forth today."). It is in this sense that we made the following statement in United States v. Holman: "In 1993, Congress amended Guideline S 2D1.1 to explain that `cocaine base,' for the purposes of that guideline, meant `crack.' " 168 F.3d 655, 658 (3d Cir. 1999).

By contrast, sentences imposed under the sentencing provisions of criminal statutes, specifically the mandatory minimum sentences, cannot be similarly affected simply because of Congress' silent approval of the Commission's amendment. At least two reasons support this conclusion. First, the Commission lacks the power to do so. Congress created the Sentencing Commission as an independent agency within the Article III Judiciary. See 28 U.S.C. S 991(a). The purposes of the Sentencing Commission are

36

twofold: (1) "establish sentencing policies and practices for the Federal criminal justice system"; and (2)"develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing." Id. S 991(b). In carrying out these purposes, Congress empowered the Commission to "establish general policies and promulgate such rules and regulations for the Commission as are necessary." Id. S 995(a)(1). However, nowhere in Title 28, Chapter 58 of the United States Code did Congress delegate to the Commission the power, directly or indirectly, to promulgate amendments to the statutory code itself. See Mistretta, 488 U.S. at 396 (stating that the Guidelines "do not . . . vest in the Judicial Branch the legislative responsibility for establishing minimum and maximum penalties for every crime. They do no more than fetter the discretion of sentencing judges to do what they have done for generations -- impose sentences within the broad limits established by Congress."). Second, as the Jackson court succinctly stated, neither the plain language of 21 U.S.C. S 841(b)(1) nor the statute's legislative history reveals that Congress limited the term "cocaine base" to crack. See 968 F.2d at 162. The only proper inference we can draw from Congress' use of the chemical term "cocaine base," without explanation or limitation, is that it intended the term to encompass all forms of cocaine base.

We recognize that the Commission's 1993 amendment could arguably be construed as providing more specificity to the provisions already existent in the statute, and, in that sense, it does not alter what has already been legislated. In fact, we have previously acknowledged that the amendment conforms to Congress' intent to punish offenders who traffic in crack more severely than those who traffic in cocaine. See Holman, 168 F.3d at 658. However, focusing solely on that congruity obscures the limitations on permissible judicial constructions of a congressional statute. Cf. United States v. Noland, 517 U.S. 535, 542 (1996) ("statements in legislative history cannot be read to convert statutory leeway for judicial development of a rule on particularized exceptions into delegated authority to revise statutory categorization, untethered to any obligation to preserve the coherence of substantive congressional

judgments"). Whatever merit we should impart to the Commission for promulgating guidelines in accordance with Congress' desire to punish more severely certain drug trafficking, its wisdom is not germane to our construction of Congress' inclusion of mandatory minimum sentences in the drug statute itself. See Smith v. United States, 508 U.S. 223, 231 (1993) (characterizing as "dubious" the assumption that the Commission's guidelines are relevant to the construction of a sentencing statute). Thus, we are firmly convinced that the making of substantive (indeed, any) changes to the drug statutes is a task residing solely in the province of the Legislature and not in an arm of the Judiciary. Cf. Mistretta, 488 U.S. at 377 ("[A]lthough Congress granted the Commission substantial discretion in formulating guidelines, in actuality it legislated a full hierarchy of punishment -- from near maximum imprisonment, to substantial imprisonment, to some imprisonment, to alternatives -- and stipulated the most important offense and offender characteristics to place defendants within these categories"). Were it otherwise, the creation of the Sentencing Commission and the delegation to promulgate amendments to the statute itself would raise serious constitutional implications that would likely run afoul of the doctrines of legislative delegation and separation of powers. See Loving v. United States, 517 U.S. 748, 758 (1996) ("The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, U.S. Const., Art. I, S 1, and may not be conveyed to another branch or entity."); Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992) ("[T]he Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts."); see generally Mistretta, 488 U.S. at 371-412 (holding that, in creating the Sentencing Commission, Congress neither delegated excessive legislative power nor upset the balance of powers among the coordinate branches).

Therefore, we hold that, while the term "cocaine base" means only crack when a sentence is imposed under the Sentencing Guidelines, "cocaine base" encompasses all forms of cocaine base with the same chemical formula

when the mandatory minimum sentences under 21 U.S.C.
S 841(b)(1) are implicated. Accordingly, the controlled
substance in this case, which was 85% pure cocaine base
but not crack, subjects Barbosa to the statutory mandatory
minimum for cocaine base. We thus affirm the District
Court's imposition of the 240-month sentence.

IV.

Aside from sentencing, Barbosa challenges the District
Court's denial of his motion for a new trial based upon the
discovery of the additional payments and reward monies to
Disla and Morel. Specifically, Disla received an additional
$500 payment a few days after the trial concluded in
January 1999, and both informants received a $25,000
reward in April 1999. We review the District Court's
decision for an abuse of discretion. United States v. Saada,
212 F.3d 210, 215 (3d Cir. 2000).

The District Court is empowered to grant a new trial on
the basis of newly discovered evidence "if the interests of
justice so require." Fed. R. Crim. P. 33. The standard under
Rule 33 is:

>        (a) the evidence must be in fact newly discovered, i.e.
>        discovered since trial;
>
>        (b) facts must be alleged from which the court may
>        infer diligence on the part of the movant;
>
>        (c) the evidence relied on must not be merely
>        cumulative or impeaching;
>
>        (d) it must be material to the issues involved; and
>
>        (e) it must be such, and of such nature, as that, on a
>        new trial, the newly discovered evidence would
>        probably produce an acquittal.

Id. at 216 (quoting Government of the Virgin Islands v. Lima,
774 F.2d 1245, 1250 (3d Cir. 1985)).

After a full hearing on the merits in which testimony was
taken, the District Court found that there was no dispute
that the later payments were newly discovered and that
Barbosa's "indefatigable counsel was exemplary in his

diligence." However, the court also found that the final three factors had not been satisfied. That is, in light of the overwhelming evidence of guilt in the record, and defense counsel's searching cross-examination and closing in which he portrayed the informants as essentially on the DEA's payroll, the evidence of the additional payments was only cumulative or impeaching, and not material to the issue of entrapment. Thus, the court concluded (quoting United States v. Johnson, 199 F.3d 123, 128 (3d Cir. 1999)) that "this new evidence would in no way have `put the whole case in such a different light as to undermine confidence in the verdict, and would have been merely cumulative.' "

Having reviewed the transcripts of both the trial and the Rule 33 hearing, we conclude that the District Court's factual findings with respect to the newly discovered evidence were not clearly erroneous. The additional payments to Disla and Morel, while concededly subject to disclosure so as to afford defense counsel an opportunity to cross-examine the informants on them, were not finalized or guaranteed, and, in fact, were only nominations at the time of trial. Moreover, none of the payments was in exchange for testimony, but for work completed on investigations for the DEA. Although the $25,000 rewards were quite large, they were primarily for the results of the extraordinary drug seizure in Aruba and not because of the apprehension and conviction of Barbosa. We also note that, although the record is replete with evidence of Barbosa's guilt, the District Court obviously felt that there was sufficient evidence on which to instruct the jury on his entrapment defense.

Therefore, on these facts, we conclude that the District Court properly exercised its discretion to deny the new trial motion based upon this newly discovered evidence because that evidence would merely have been cumulative or impeaching, immaterial to the issue of entrapment, and would not have likely produced an acquittal. We will thus affirm the denial of Barbosa's new trial motion.

V.

Finally, Barbosa challenges the entirety of his criminal proceedings, contending that the Government's conduct

40

resulting in his eventual arrest was outrageous as a matter of law. Specifically, Barbosa claims that the Government had orchestrated the entire narcotics transaction and had unnecessarily created an unreasonable risk of death. Citing the danger of digestive acids dissolving the packaging materials surrounding the swallowed pellets, Barbosa points to the increasing risk of a fatal mishap as more time elapses before the ingested drugs are expelled. Notwithstanding this risk of fatality, the Government purportedly solicited his assistance through its paid informants (particularly Disla) and induced him to travel to Aruba, to swallow approximately one kilogram of heroin, and then to return to the United States. Moreover, to further exacerbate that risk, the informants insisted that he accompany them by car for several hours to Philadelphia, thereby increasing the time during which the drugs remained in his system. (He surmises that the only reason for this leg of the journey was to establish jurisdiction in the Eastern District of Pennsylvania for the arrest.) According to Barbosa, this risk was wholly unnecessary as the arrest could have been effectuated in Aruba (as the Government later did with Zorilla) and extradition proceedings commenced because the entire investigation was being handled with the full cooperation of the Aruban government. We exercise plenary review over the District Court's legal conclusions in denying Barbosa's motions to dismiss the indictment and review any challenges to the court's factual findings for clear error. United States v. Nolan–Cooper, 155 F.3d 221, 229 (3d Cir. 1998).

It is well settled in this Circuit that "a criminal defendant may raise a due process challenge to an indictment against [him] based on a claim that the government employed outrageous law enforcement investigative techniques." United States v. Nolan–Cooper, 155 F.3d 221, 229 (3d Cir. 1998) (citing United States v. Voigt, 89 F.3d 1050, 1064 (3d Cir. 1996)). In determining whether a defendant is entitled to a vacatur of the conviction based upon outrageous government conduct, we note that:

> the challenged conduct must be shocking, outrageous, and clearly intolerable. . . . The cases make it clear that this is an extraordinary defense reserved for only

41

> the most egregious circumstances. It is not to be
> invoked each time the government acts deceptively or
> participates in a crime that it is investigating. Nor is it
> intended merely as a device to circumvent the
> predisposition test in the entrapment defense. Though
> lacking in "mathematical precision," the "shocking,
> outrageous, and clearly intolerable" standard provides
> sufficient guidance to courts attempting to assess
> whether particular government conduct is
> fundamentally unfair and thereby offends due process.

United States v. Nolan-Cooper, 155 F.3d 221, 231 (3d Cir.
1998) (internal citations omitted).

We recognize that Barbosa's life was arguably placed in
danger by the Government's sting operation. We also
recognize, however, that narcotics trafficking necessarily
entails a risk of death or serious bodily harm, such as from
the use of firearms and other enforcement measures to
protect or seize the contraband and money, as well as from
the ancillary criminal activity that accompanies the drug
trade. In fighting this "war on drugs," law enforcement
personnel have needed to develop a number of
sophisticated and covert investigatory techniques. One of
these techniques involves the creation of what appear to be
authentic drug transactions, oftentimes with the joint
participation of both law enforcement personnel (or their
designees) and the targets of the investigation. Such
subterfuge is a well recognized and permissible means of
investigation. Therefore, endangerment to the lives of the
agents, informants, and targets involved, which is inherent
in the drug trafficking trade, must also be permissible. It is
incumbent upon the government, however, to police its own
conduct and consistently revisit the parameters and
constitutionality of its enforcement activities.

Smuggling narcotics into this country through swallowing
or "body-packing" has unfortunately become both an
effective and lucrative criminal enterprise. See, e.g., John
Otis, The Drug Quagmire: Mules Ferry Drugs Across Borders
in Game of Chance, Houston Chronicle, July 16, 2000, at
30, available at 2000 WL 4311185 ("The technique . . . has
become one of the most effective ways to smuggle heroin
and cocaine out of Colombia . . . . [S]wallowers are believed

42

to be responsible for up to half the Colombian heroin that reaches the United States."). Yet, this mode of conveyance is fraught with grave peril to the courier (also called a "mule," "packer," or "swallower") in the rare but potentially real situation in which the wrapped pellets burst before they can be expelled. Drug swallowing can even be fatal because acids in the digestive tract can dissolve the latex packaging materials, thereby releasing massive doses of narcotics into the body. See, e.g., id. (stating that eating solid foods after ingesting drugs causes release of gastric acids that can burn through the latex, leading to massive overdose and death); see also Edward Barnes, Undertaker For the Mules "Don Orlando" Is the Man to Call When Cocaine Couriers Perish On the Job, Time Mag., Aug. 18, 1997, at 2, available at 1997 WL 10902776; Gary Wisby, Cocaine Smuggling Becomes Inside Job: "Packing" It Internally Risks Death -- Officials, Chicago-Sun Times, June 23, 1997, at 4, available at 1997 WL 6356660.

The dangers inherent in the targeted criminal activity comprise a threshold level, which, if unreasonably surpassed by the Government in zealously pursuing an investigation or prosecution, would offend fundamental fairness and due process. We believe that such a guiding principle comports with our outrageous government conduct jurisprudence, at least as applied to the distinctive norms found in the context of modern drug trafficking activities.

However cold or callous the Government's stance towards Barbosa may seem, this case does not involve the classic example of a courier (perhaps with low income, low education, and little practical skills) who was enticed, coerced, or exploited by an affluent, sophisticated drug dealer to smuggle drugs into the United States through ingestion. See, e.g., Smugglers Who Swallow Drugs Risk Death For Cash, Sun-Sentinel, July 23, 2000, at 4B, available at 2000 WL 22186881 ("Customs Special Agent Zach Man said smugglers recruit poor men and women to carry drugs into the country, often promising weekend vacations in South Florida and the chance to make`more money in a single trip than they make in an entire year.' "); Mireya Navarro, Big Gulp in Cali Can Bring Hard Time, Fast

Death in Miami, Pittsburgh Post-Gazette, Nov. 5, 1995, at A9, available at 1995 WL 9541894 (reprinting Nov. 2, 1995 N.Y. Times article) (describing coercion defense at trial of Colombian businessman who claimed he had been kidnaped by men and forced to swallow pellets containing heroin). On this record, Barbosa was apparently a willing participant in the operation to smuggle drugs to Philadelphia from Aruba, and he exhibited a level of professionalism concerning the activity of drug swallowing not typically found in the average courier.

At trial, the evidence revealed that Barbosa was extremely knowledgeable about packaging and swallowing drugs. He told the informants that he regularly engaged in swallowing drugs for other dealers and further claimed that he managed persons who brought drugs into the country through swallowing, even teaching them how do it. Barbosa had, in fact, been previously convicted in federal court for drug smuggling using the same illicit methodology, and as the recorded conversations demonstrated, Barbosa was aware of the going price of heroin in both Aruba and New York. He revealed the extent of his swallowing expertise by dictating the travel arrangements, both going to and returning from Aruba, and by timing the drug transaction, both as to when he would swallow the pellets and as to when he would discharge them. While Barbosa claims that he would never have met Disla or Morel were it not for the actions of the Government, Barbosa neglects to acknowledge that his introduction to Disla was facilitated by Zorilla, whom he had previously known. Indeed, the Government was not even aware of Barbosa until his meeting with Disla, and Disla had no way in which to contact Barbosa except through his pager number. Moreover, it was Barbosa who made the arrangements with Zorilla for the delivery of the drugs in Philadelphia. And in that respect, we note that his acquiescence in being driven to Philadelphia was voluntary and not compelled by Disla or the DEA. Although the record also showed that he was unable to dictate to Zorilla his preferred pellet size and did not package the pellets himself, Barbosa neither questioned Zorilla about the contents of the pellets nor inquired into the manner in which they were packaged. This brazen display of confidence in the integrity of the contraband he

44

was about to ingest stands in stark contrast to any reckless behavior we might impute to the Government in permitting him to proceed with the transaction.

In arranging for Barbosa's arrest in the Philadelphia hotel room, the DEA unmistakably facilitated and brought to fruition the illegal drug trafficking from Aruba. However, the Government neither initiated this particular transaction, provided any expertise on the swallowing technique, nor supplied the illegal contraband. DEA agents were also absent during the entire time Barbosa was in Aruba and had only Barbosa's limited contact by phone with Disla to verify what had transpired in the hotel room in Aruba with Zorilla and the drugs. The DEA also had no obligation to have agents in Aruba or to make the arrest in Aruba where it was not permitted to exercise enforcement jurisdiction. Indeed, it is well established that"[l]aw enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." Hoffa v. United States, 385 U.S. 293, 310 (1966).

Barbosa nonetheless contends that, despite his professed expertise in swallowing almost a kilogram of drugs, he should not be judged upon his own willingness to risk his own life, and that factors beyond his control could prolong the time during which the drugs were in his system, thereby increasing the likelihood that the pellets would explode in his system. However, the fact that there was no evidence that Barbosa had any difficulty in executing the swallowing or that he feared for his safety militates against any possible argument that the Government was on notice that the risk to Barbosa was unacceptably compromised. Given the inherent risk of death or serious bodily harm in drug trafficking through swallowing, there would have to be evidence in the record that the Government unreasonably increased that risk before we would be compelled to conclude that the Government's conduct was "shocking, outrageous, and clearly intolerable." At best, the record revealed that Barbosa may have exhibited some nervousness in the car ride to Philadelphia; but the

45

Government would not have even known that fact until well after their arrival at the hotel when, presumably, the DEA agents debriefed Disla and/or Salcedo. As the record revealed, agents arrested Barbosa immediately after he safely expelled all the pellets.

Barbosa also urges us to adopt a rule of law that drug swallowing is so life threatening that it is per se violative for the Government to place a defendant in the position of a courier who swallows drugs and transports them. However, there is nothing in the record or even general common sense notions from which to draw such a blanket rule. On the contrary, a per se rule would place severe restrictions on the ability of law enforcement personnel to combat narcotics trafficking. Indeed, as we have previously noted, "[n]o federal judge can be unaware of the vastness of government undercover operations which seek to apprehend those engaged in that reprehensible trade." United States v. Jannotti, 673 F.2d 578, 609; see also Hampton v. United States, 425 U.S. 484, 495 n.7 (1976) (Powell, J., concurring) ("One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic, which is one of the major contributing causes of escalating crime in our cities.") (citations omitted). In accord with our analysis above, a court's evaluation of a particular governmental enforcement tactic must be conducted in the context of the specific law enforcement problem to which that tactic is directed. Under the facts of this case, the Government's use of a known drug swallower in a sting operation did not rise to a level of outrageousness sufficient to offend Barbosa's due process rights.

In sum, the Government had every reason to believe in good faith that Barbosa was a willing participant in this highly dangerous form of drug trafficking, and thus, its conduct was not sufficiently "shocking, outrageous, and clearly intolerable" such that a vacatur of the conviction is warranted. Under the evidence adduced at trial, we conclude that the Government's conduct here was not fundamentally unfair and offensive to due process, and therefore, we affirm the conviction on this ground.

VI.

For the foregoing reasons, we conclude that Barbosa was properly sentenced based upon the cocaine base he unwittingly, but actually, brought into the country, and that the District Court properly imposed the statutory mandatory minimum sentence for cocaine base. We further conclude that the District Court properly denied Barbosa's motion for a new trial based upon the newly discovered evidence of additional payments to the two government informants. Finally, we conclude that the District Court properly denied his motions to dismiss the indictment for outrageous government conduct. Accordingly, we affirm the District Court's judgment.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

47